UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVON WILLIAM FREEMAN,<br><br>Defendant. | Criminal Action No. TDC-22-0454 |

**MEMORANDUM OPINION**

Defendant Davon William Freeman has been charged with one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), arising out of a January 25, 2022 police search of his person and vehicle conducted in District Heights, Maryland. Freeman has filed a Motion to Suppress, ECF No. 27, in which he seeks suppression of two firearms seized at the scene on the grounds that they were found during searches conducted in violation of his rights under the Fourth Amendment to the United States Constitution. After the Motion was fully briefed, the Court held an evidentiary hearing on the Motion on June 21, 2024. For the reasons set forth below, the Motion will be GRANTED.

**BACKGROUND**

The following facts were established at the evidentiary hearing based on the testimony of Corporal Timothy Green of the Prince George's County Police Department ("PGCPD") and the exhibits admitted as evidence, including a video recording from the body-worn video camera of PGCPD Officer Carolyn Cosey ("the Cosey Video"). Mot. Suppress Hrg. ("Hrg.") Ex. 1.

On January 25, 2022 at approximately 10:22 p.m., Corporal Green and Officer Cosey were on a proactive patrol in District Heights, Maryland as part of the PGCPD Criminal Activity

Suppression Team. At the prompting of a radio call from another officer, PGCPD Officer Eason, Corporal Green and Officer Cosey proceeded to Scott Key Drive, near the intersection with District Heights Parkway, and approached a silver Toyota Camry ("the vehicle") parked near a streetlight with its headlights on and its engine running. The vehicle was in a residential neighborhood within an area which, according to Corporal Green, was known as a high-crime area, including in relation to violent crimes. As they approached the vehicle, Officer Eason was nearby, in an unmarked police vehicle, positioned at the beginning of Scott Key Drive.

Upon reaching the driver's side of the vehicle, Officer Cosey shined a flashlight through the driver's window, saw Freeman asleep in the driver's seat, then knocked on the window several times to awaken him. After about 10 seconds, Freeman opened his eyes. Officer Cosey then opened the vehicle door and asked Freeman, the sole occupant of the vehicle, where he lived. Freeman responded by pointing to the right of the vehicle. Officer Cosey asked Freeman if he had been drinking, and Freeman answered that he had been drinking earlier. Freeman's speech was slurred, and he did not use complete sentences. Officer Cosey then asked if Freeman had not been able to make it home. After Freeman acknowledged that he was on his way home but could not make it and had pulled over to the side of the road, Officer Cosey responded that his actions were "responsible." Cosey Video Tr. at 3, Hrg. Ex. 1A.

When Officer Cosey asked Freeman for identification, Freeman pointed to the driver's side door map compartment, which contained a wallet with his driver's license. Officer Cosey brought Freeman's wallet and license to the rear of the vehicle while Corporal Green asked Freeman where he lived and for his address. Officer Cosey, apparently looking at Freeman's license, which listed an address of 2306 Delano Lane, then said that Freeman lived "down the street." *Id.* at 4. At the hearing, Corporal Green acknowledged that when asked where he lived, Freeman had said "over

2

there," that Delano Lane was located to the right of the vehicle as it was parked, in the general direction to which Freeman had pointed at the outset of the encounter, and that it was a two-minute walk from the location of the vehicle. Hrg. Tr. at 54-56.

Officer Cosey radioed the police dispatcher ("the dispatcher") for information about Freeman based on the details appearing on Freeman's license, including whether he had any outstanding warrants. While Officer Cosey awaited a response from the dispatcher, Corporal Green advised Freeman that if was going to take a nap in the vehicle, he should "check" his headlights, and that he should find somewhere else to sleep because they were not in the "safest place for you to go to sleep." Cosey Video Tr. at 4-5.

At approximately 10:27 p.m., the dispatcher informed the officers that Freeman appeared to be "negative all around" for any outstanding warrants but also noted that "officer safety" information was available. *Id.* at 5. The dispatcher then stated that Freeman had "multiple priors," including for first-degree murder, armed robbery, assaults, and the distribution and manufacture of controlled dangerous substances. *Id.* At the hearing, Corporal Green acknowledged that such references to "priors" are not limited to convictions but also include prior arrests and charges, even if they did not result in convictions. He also acknowledged that such references do not provide information on the date of the prior charges or the underlying circumstances.

Upon hearing this information, Corporal Green immediately ordered Freeman out of the vehicle, and Freeman stepped out without showing any difficulty moving or standing. Corporal Green then ordered Freeman to turn around and put his hands on top of the vehicle, which Freeman did. Corporal Green then asked Freeman whether he had anything "on you that's going to poke, stick me, cut me, nothing like that?" *Id.* at 5. At the hearing, Corporal Green testified that he asked this question for his own safety so that he knew "exactly what we are dealing with" and that

3

it was also "an indication to the person that's about to be pat[ted] down that we are indeed going to pat him down." Hrg. Tr. at 28. Although Freeman's response cannot be heard on the Cosey Video, according to Corporal Green, Freeman responded by referencing a knife and reaching toward his right pants pocket. Corporal Green then asked whether Freeman had a knife, moved Freeman's hands back to the top of the vehicle, and reached into Freeman's right pants pocket. Corporal Green pulled out a firearm, called out "7A," a PGCPD code used to reference a firearm, and handed the firearm to Officer Cosey. Cosey Video Tr. at 5-6. Officer Cosey brought the firearm to the rear of the vehicle and rendered it safe while Corporal Green placed Freeman in handcuffs. At that point, Officer Eason and other officers arrived at the vehicle. Officer Cosey then conducted a search of the interior of the vehicle, including a backpack found on the front passenger seat, and found a second firearm in that backpack.

On December 21, 2022, a federal grand jury returned the Indictment against Freeman charging him with one count of possession of firearms by a felon, in violation of 18 U.S.C. § 922(g)(1).

## DISCUSSION

In the Motion to Suppress, Freeman argues that the two firearms seized during the encounter should be suppressed because the officers located them during searches that violated the Fourth Amendment. The Government argues that the first firearm was located during a lawful pat frisk pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), because the officers had a reasonable suspicion of criminal activity as required to conduct a *Terry* stop and also had a reasonable suspicion that Freeman was armed and dangerous as required to conduct a *Terry* frisk. Specifically, the Government argues that the officers had a reasonable suspicion that Freeman was armed and dangerous because Freeman appeared to be intoxicated, was found in a parked vehicle with the

engine running in a high crime area, and the police dispatcher reported that Freeman had "multiple priors," including for first-degree murder, armed robbery, and assault. Cosey Video Tr. at 5. The Government alternatively argues that the officers had probable cause to arrest Freeman on alcohol-related offenses such that the search was permissible as a search incident to arrest. Freeman disputes that there was a sufficient basis to support a reasonable suspicion that he was armed and dangerous, or that there was probable cause to arrest him for operating a vehicle under the influence of alcohol.

**I.      Legal Standard**

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Generally, evidence obtained during a search or seizure conducted in violation of the Fourth Amendment is to be excluded at trial pursuant to the exclusionary rule. *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014). A traffic stop constitutes an investigatory seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

**II.     *Terry* Stop-and-Frisk**

The Government primarily argues that the firearm was recovered during a lawful *Terry* stop-and-frisk. Consistent with the Fourth Amendment, law enforcement officers may conduct a brief investigatory stop of an individual or vehicle if they have a reasonable, articulable suspicion that criminal activity is afoot. *See Terry*, 392 U.S. at 30. Consistent with *Terry*, police officers may conduct a traffic stop if they observe conduct that establishes either probable cause or reasonable suspicion to believe that a traffic violation has occurred. *See United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2013). To conduct a frisk of a suspect during a *Terry* stop, officers

need additional justification beyond the reasonable suspicion required for the initial stop. *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998). They must have a "reasonable suspicion" that the suspect is armed and dangerous, consisting of "a particularized and objective basis for suspecting that the person to be frisked is armed and dangerous." *United States v. Powell*, 666 F.3d 180, 185-86 (4th Cir. 2011).

### A. The *Terry* Stop

At the outset, the Government argues, and Freeman does not seriously dispute, that the officers' initial approach to Freeman's vehicle and questioning of him did not constitute a *Terry* stop. Where Freeman's vehicle was already stopped by the side of the road, and the officers asked about his condition, responded in a manner demonstrating that they sought to assist Freeman, and initially did not issue any commands, there was no *Terry* stop because there had been no show of authority restraining Freeman's movements to which he had submitted. *See United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010) (holding that the Fourth Amendment was not yet implicated when officers approached the defendant's parked vehicle late at night). The *Terry* stop began when, after being informed of Freeman's alleged "priors" by the dispatcher, the tone of the encounter changed markedly, and Corporal Green ordered Freeman to step out of the vehicle. At that time, a *Terry* stop had occurred because Freeman's movements were then restrained, and a reasonable person in his position would not have felt free to leave. *See Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

The Government argues that the *Terry* stop was justified because the facts established a reasonable suspicion that Freeman had violated the law by driving while under the influence of alcohol. *See* Md. Code Ann., Transp. § 21–902 (West 2020). By the time that Corporal Green ordered Freeman out of the vehicle, the officers had observed that he was sleeping in a parked

6

vehicle with the engine running, and he had acknowledged that he had been drinking and had pulled over because he did not think that he would make it home safely. Corporal Green also observed that Freeman had slurred speech and did not speak in complete sentences. Under these circumstances, even without having seen Freeman operating the vehicle, the officers had a reasonable suspicion that he had been operating under the influence so as to justify a *Terry* stop at that time. *See United States v. Gordon*, No. 22-4282, 2023 WL 2446674, at *2 (4th Cir. Mar. 10, 2023) (holding that where an officer discovered a lone, sleeping, and disoriented person in the driver's seat of a damaged vehicle parked on a public street, and that person had glassy eyes and slurred his speech upon waking up, the officer had at least a reasonable suspicion that the passenger had recently been driving while under the influence). Freeman does not seriously argue otherwise.

### B.     Initiation of the Frisk

As for the frisk, the Government argues that the following factors collectively supported a reasonable suspicion that Freeman was armed and dangerous: Freeman's intoxication, his presence late at night in a high-crime area, and the dispatcher's report that Freeman allegedly had "priors" for violent crimes, specifically first-degree murder, armed robbery, assaults, and drug distribution and manufacture. Cosey Video Tr. at 5. The Government also argues that the officers could permissibly consider that, "as the officers were beginning to frisk" him, Freeman "indicated" that he had a knife. Opp'n at 6-7, ECF No. 55. Freeman, however, argues that the reference to the knife may not be considered because it occurred after the frisk had begun.

"The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 271 (2000). Thus, the Court must consider when the *Terry* frisk began. Here, Corporal Green's testimony established that after he ordered Freeman out of the vehicle, he directed Freeman to face the vehicle and put Freeman's

7

hands on the roof for the purpose of conducting a *Terry* frisk for weapons. Corporal Green testified that Freeman complied, and that Corporal Green then asked Freeman whether he had anything "on you that's going to poke, stick me, cut me, nothing like that?" Cosey Video Tr. at 5. Corporal Green asked this standard question at the outset of the *Terry* frisk for his own safety in conducting the search, so that he knew "exactly what we are dealing with," and also as "an indication to the person that's about to be pat[ted] down that we are indeed going to pat him down." Hrg. Tr. at 28. According to Corporal Green, after he asked that question, but before he touched Freeman, Freeman stated that he had a knife. The issue is whether the frisk should be deemed to have started at the time that Corporal Green asked his question about the presence of weapons or other dangerous objects.

At least two United States Courts of Appeals have addressed whether officers can be deemed to have initiated a *Terry* frisk before making physical contact with a person. In *Doornbos v. City of Chicago*, 868 F.3d 572 (7th Cir. 2017), the court held that as "with 'seizures,' an officer can initiate a frisk before physically touching a person." *Id.* at 581 (citing *Chesternut*, 486 U.S. at 573-74). In *Doornbos,* the court held that to determine when a frisk has begun, "we ask when a reasonable person would have believed that the search was being initiated" and found that a frisk could be deemed to have been initiated when an officer announced himself as a police officer, displayed his badge, handcuffs, and gun to the suspect, and then reached out to conduct a frisk for weapons, but before the suspect pushed his hand away and attempted to flee. *Id.* (holding that the district court erred by failing to instruct the jury in a civil case alleging excessive force on the standard required to conduct a *Terry* frisk).

By contrast, in *United States v. Weaver*, 9 F.4th 129 (2d Cir. 2021) (*en banc*), the court held that a frisk "did not begin until" the officer "began physically patting down [the defendant's]

clothing, irrespective of any reasonable belief by" the defendant "as to when the search began." *Id.* at 153. In *Weaver*, after an officer conducted a traffic stop, ordered the defendant out of the vehicle, and directed him "to stand at the rear quarter panel of the car with his hands on the trunk and his feet spread apart," the defendant complied but also began pressing his pelvic area close to the car and moving his torso against the vehicle, which the officer deemed to be "abnormal." *Id.* at 136-37. Although the defendant argued that these suspicious movements could not be considered in determining whether there was a reasonable belief that he was armed and dangerous, because the search had begun when the officer ordered him to assume the described position at the rear of the vehicle, the court held that the "verbal command to place [the defendant] in a position where a frisk might occur," and the officer's "as-yet-unexecuted intention to conduct a frisk," were insufficient to deem the frisk to have begun prior to physical contact. *Id.* at 141-42. The court reasoned that without "an actual physical trespass or violation of a person's reasonable expectation of privacy, no search can have occurred." *Id.* at 146.

Here, the Government acknowledged in its memorandum in opposition to the Motion that Freeman referenced the knife "as the officers were beginning to frisk" Freeman, Opp'n at 6, which would preclude a finding that it was a fact that the officers "knew before they conducted their search," as required to be considered in assessing whether there was a sufficient basis to conduct the pat frisk. *See J.L.*, 529 U.S. at 271. Even without relying on this apparent concession, which the Government did not reaffirm at oral argument on the Motion, the Court concludes that the frisk began prior to Freeman's alleged admission regarding a knife, such that it may not be considered as a factor in determining whether reasonable suspicion existed. The facts here more clearly establish that the frisk had been initiated than in either *Doornbos* or *Weaver*. Significantly, unlike in *Weaver*, Corporal Green went beyond merely ordering Freeman to stand facing the vehicle with

9

his hands on top of the vehicle, which the Court agrees does not necessarily reflect an intent to conduct a pat frisk and does not constitute the initiation of a pat frisk. *Weaver*, 9 F.4th at 136. Without necessarily accepting the standard adopted in *Doornbos*, the Court finds that Corporal Green's question about whether Freeman had any sharp objects that could harm him, which immediately followed his ordering of Freeman into a position ordinarily associated with a pat frisk, exhibited a clear, unmistakable intent to conduct a frisk such that a "reasonable person would have believed that the search was being initiated." *See Doornbos*, 868 F.3d at 581. Notably, the *Weaver* court, while rejecting the view that the officer's subjective intent should be considered, and concluding that there needs to be a "physical trespass into a protected area" or a violation of "the person's reasonable expectation of privacy" for a search to have occurred, *Weaver*, 9 F.4th at 146, separately stated that it did not "foreclose the possibility that, in certain circumstances, a police officer might effectuate a search through a verbal command, without physically touching a person." *Id.* at 142 & n.52.

This case presents such circumstances. Corporal Green's question, which he asked after he ordered Freeman into the physical position associated with a pat frisk, constituted the first step in the standard police procedure of conducting a frisk. Indeed, Corporal Green specifically acknowledged that one of the purposes of the question was to signal that Freeman would be subjected to a pat frisk. In *United States v. Wetmore*, 560 F. Supp. 3d 591 (D.N.H. 2021), the court addressed a similar scenario and held that a *Terry* frisk began when the officer, after having ordered the suspect to "assume the search position" of facing and placing his hands on a vehicle, verbally announced to the suspect that he was going to conduct a pat frisk. *Id.* at 610. The court reasoned that frisks are "not limited to traditional pat-downs," and that the "announcement of the pat-down and order to [the defendant] to assume the search position were logically and practically

10

inseparable from the pat-down itself." *Id.* at 608, 610. Here, Corporal Green's question not only announced the search, but went one step beyond by initiating the process of ascertaining whether Freeman was in possession of a weapon or other dangerous object.

Notably, the purpose of Corporal Green's question at the outset of the pat frisk was to provide a safer means to accomplish the goal of the frisk—to identify and secure weapons or dangerous objects—by providing the officer with information that reduces the risk that, while conducting the frisk, the officer will be inadvertently injured when touching or grasping a knife, syringe, or another dangerous object. To hold that the response to such a question occurred before the frisk began, and thus may be considered in evaluating whether the frisk was justified, would be entirely unreasonable because it would both penalize a defendant for cooperating in protecting officer safety and increase the risk to officers by severely disincentivizing candid responses. Where such a question is clearly part of the police procedure for a pat frisk designed to ascertain the location of any weapons and thus to protect officers conducting such frisks, it is not merely a "prelude to a frisk." *Weaver*, 9 F.4th at 146. Rather, it is "logically and practically inseparable from the pat-down itself." *Wetmore*, 560 F. Supp. 3d at 610. Therefore, under these facts, the Court deems the pat frisk to have begun when Corporal Green asked Freeman whether he had any sharp objects that could harm him and thus will not consider Freeman's alleged admission that he had a knife in determining whether the officers had a reasonable suspicion that Freeman was armed and dangerous as required to justify a *Terry* frisk.

### C. *Terry* Frisk

The Court next considers whether the facts available to the officers prior to the pat frisk were sufficient to support that action. "To justify a patdown of the driver or a passenger during a traffic stop," the "police must harbor reasonable suspicion that the person subjected to the frisk is

11

armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *Powell*, 666 F.3d at 185-86. To meet this standard, the officers must have "a particularized and objective basis for suspecting that the person to be frisked is armed and dangerous." *Powell*, 666 F.3d at 185-86. The test is whether a "reasonably prudent" person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 186 (quoting *Terry*, 392 U.S. at 27). Reasonable suspicion "is measured by the totality of the circumstances." *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Here, the Government argues that there was a reasonable suspicion that Freeman was armed and dangerous based on the facts that he was found at night on a dark street in a high-crime area, he appeared to be under the influence of alcohol, and the officers had received a radio report that he had "multiple priors" for violent crimes. Cosey Video Tr. at 5. The Government also references the fact that the vehicle's windows were darkly tinted.

The fact that an encounter occurred late at night in a high-crime area may be a relevant consideration on whether a *Terry* frisk is justified. *See United States v. George*, 732 F.3d 296, 300 (4th Cir. 2013). However, "general evidence that a stop occurred in a high-crime area, standing alone, may not be sufficiently particularized to give rise to reasonable suspicion." *Id.* Although whether a person was "under the influence" may be considered, *see Michigan v. Long*, 463 U.S. 1032, 1050 (1983), the Government has not identified, and the Court has not found, cases in which a *Terry* frisk was justified based only on intoxication while in a high-crime area at night.

Other, more compelling factors generally need to be present. For example, in *Long*, cited by the Government, the Supreme Court upheld a *Terry* frisk not just because the defendant was intoxicated; rather, the defendant "was not frisked until the officers observed that there was a large knife in the interior of the car into which [the defendant] was about to reenter." *Id.* In *United*

*States v. Patton*, 705 F.3d 734 (7th Cir. 2013), also cited by the Government, officers encountered the defendant late at night in a high-crime area among a group of men who were consuming alcohol, but the *Terry* frisk was justified primarily because the defendant set himself apart from the other men, did not comply with officer instructions, started to back away in a manner suggesting "purposeful evasion," and looked side to side with a "nervous demeanor" suggesting that he was "looking for an escape route." *Id.* at 739. In *United States v. Harrington*, 56 F.4th 195 (1st Cir. 2022), the court's upholding of a frisk of a defendant found in a high-crime area and showing "clear signs of opioid impairment" relied in part on "the common association between drug transactions and weapons" and the facts that the defendant reached for something inside his vehicle, did not obey officer commands, and reached toward his pocket. *Id.* at 204. By contrast, Freeman cooperated with all instructions provided, did not exhibit a nervous demeanor, did not reach for anything, and did not act in an evasive manner. There is no evidence of any common association between consuming alcohol and the presence of dangerous weapons. Thus, Freeman's apparent intoxication at night in a high-crime area does not support a reasonable suspicion that he was armed and dangerous. The other facts relating to the location of the encounter, that the street was dark and that the vehicle windows were darkly tinted, are of little consequence where the video evidence shows that the vehicle was parked under a streetlight, and the vast majority of the officers' encounter with Freeman occurred after Officer Cosey had opened the driver's side door, at which point the officers were face-to-face with Freeman, rendering the window tint irrelevant.

Thus, the only significant fact present here was the dispatcher's report that Freeman had "multiple priors" for violent crimes. Cosey Video Tr. at 5. Indeed, where the officers took no actions suggesting that they were going to conduct a *Terry* stop, much less a *Terry* frisk, before they heard that report from the dispatcher, it is clear that the frisk was motivated almost exclusively

13

by that report. Under binding precedent, however, such a report does not justify a *Terry* frisk. In *Powell*, officers conducted a nighttime traffic stop based on a burned-out headlight and encountered a driver and two passengers, including the defendant. *Powell*, 666 F.3d at 183. Records checks revealed that the driver had a suspended driver's license, and that the defendant had both a suspended license and "priors" for armed robbery, which the officers understood to mean that he had been charged with that crime, but it was unclear whether or not he had been convicted of the crime. *Id.* at 184. At that point, the officer ordered the defendant out of the vehicle and conducted an "officer-safety patdown." *Id.* at 182, 184. The court held that where the encounter had been "entirely amicable and cooperative," there had been no "threatening or evasive conduct," and there was no sign of drug dealing, gang affiliation, or a concealed weapon, the information about the prior armed robbery charges and a possible misrepresentation by the defendant on whether his license was suspended were not enough to justify the frisk. *Id.* at 187-89. The court held that while "a person's possible involvement in prior criminal activity" as reflected in such "caution data" can be relevant to the issue of reasonable suspicion, "[a] prior criminal record is not, standing alone, sufficient to create reasonable suspicion." *Id.* at 188. More specifically, the court found that the "caution data" at issue provided little detail "concerning when the priors occurred or whether they even involved convictions," and that where there was a "striking lack of specificity of the information," including on the age of the charges and whether they resulted in convictions, the caution data did not establish "reasonable suspicion that [the defendant] was armed and dangerous on the night of the traffic stop." *Id.*

*Powell* largely controls here. As in *Powell*, the dispatcher's report of Freeman's alleged "multiple priors" provided no information on when those charges arose and whether Freeman was convicted of them. Indeed, although not known to the officers at the time and thus not subject to

consideration for purposes of the Motion, it is undisputed that the murder charge and the armed robbery charge did not result in convictions, the assault conviction dated back to 1997, and the drug charge was misreported as relating to the manufacture of controlled substances when it actually was for distribution of a dipped cigarette. Under *Powell*, such caution data does not alone support a reasonable suspicion that an individual encountered in a traffic stop is armed and dangerous and thus does not justify a *Terry* frisk. *Id.* at 188.

The Government's efforts to distinguish *Powell* are unconvincing. First, it notes that the dispatcher reported more priors about Freeman, including one for murder, than were at issue in *Powell*. Although the number and nature of the reported "priors" about Freeman may have been more serious that the caution data in *Powell*, the *Powell* court's ruling was not predicated on the lack of a sufficient number of priors or the lack of sufficiently severe crimes among the priors; rather, the court found the priors for the violent crime of armed robbery alone "insufficient to establish reasonable suspicion" that the defendant was armed and dangerous primarily because, as is the case here, there was no information provided that established when the priors occurred or whether any actually resulted in convictions. *Id.* Notably, when the *Powell* court stated the general principle that "in most instances, [a] prior criminal record is not, standing alone, sufficient to create reasonable suspicion," *id.*, it did not qualify that pronouncement based on the number and nature of prior charges.

Second, the Government argues that the additional facts present here—that Freeman had been drinking and that the encounter occurred at night in a high-crime area—distinguish this case from *Powell*. As discussed above, however, these facts were of such limited consequence that, as reflected on the Cosey Video, the officers treated the encounter as a welfare check and took absolutely no steps toward detaining or frisking Freeman until the point that they received the

15

information about the priors, such that the decision to frisk Freeman was, as in *Powell*, based solely on the reported priors. *See Powell*, 666 F.3d at 188. Significantly, in this instance, the facts of possible intoxication and presence at night in a high-crime area had been rendered largely unremarkable by the time that the dispatcher reported on the priors. Before that time, the officers had already concluded that while Freeman may have been intoxicated, he had acted in a "responsible" manner by pulling to the side of the road where he fell asleep. Cosey Video Tr. at 3. Despite his prior drinking, as acknowledged by Corporal Green, Freeman was cooperative through the encounter until the first firearm was found, obeyed all orders, and made no suspicious movements. The officers also knew before the frisk that although the vehicle was found within a high-crime area, Freeman resided nearby, only two minutes from home, and had not made it home because he had been drinking, such that there was a clear explanation for his presence in the area for reasons other than criminal activity. In fact, while Officer Cosey was communicating with the dispatcher, rather than seeking to ascertain whether Freeman was engaged in criminal activity, Corporal Green offered Freeman advice that he should not sleep in that location for his own safety.

Where the facts available to the officers effectively dispelled the notion that Freeman's intoxication and presence in a high-crime area presented a threat to the officers, the report on his priors not only stood alone as a possible basis for concern, but also was of lesser significance when viewed alongside the remaining circumstances. *See Powell*, 666 F.3d at 187, 189 (finding that even with the report that the defendant had priors for armed robbery and the fact that he had made an apparent misrepresentation on whether his driver's license was suspended, there was no reasonable suspicion that the defendant was armed and dangerous in part because of the overall context of the *Terry* stop, which was otherwise "amicable, cooperative, and relatively safe [in] nature" and lacked any "threatening or evasive conduct").

Finally, the Government's reliance on *United States v. Holmes*, 376 F.3d 270 (4th Cir. 2004), is unpersuasive. In *Holmes*, the court upheld a protective search for weapons of a vehicle in which the defendant had been riding where the officers had stopped the vehicle because they had a reasonable belief that the defendant was a specific suspect with an outstanding arrest warrant for conducting numerous armed robberies of drug dealers with fellow gang members. *Id.* at 274, 277-78. Here, by contrast, the officers did not approach the vehicle as part of an effort to apprehend a suspect with an outstanding warrant for violent crimes, and the dispatcher specifically noted that Freeman was "negative all the way around" for outstanding warrants. Cosey Video Tr. at 5.

For all of these reasons, the Court finds that, pursuant to *Powell* and based on the totality of the circumstances, the officers lacked a "particularized and objective basis" to support a reasonable suspicion that Freeman was armed and dangerous as necessary to justify the *Terry* frisk. *Powell*, 666 F.3d at 185-86.

### III.   Probable Cause

The Government alternatively argues that even if there was no basis to conduct a *Terry* frisk, the circumstances established that the officers had probable cause to arrest Freeman for alcohol-related offenses, such that the frisk was justified as a search incident to arrest. Freeman counters that the officers lacked probable cause to arrest him on any alcohol-related offenses, and that the officers' failure to conduct any field sobriety tests ("FSTs") during the stop weighs against a finding that probable cause was present.

Upon consideration of the record, the Court concludes that the officers lacked probable cause to arrest Freeman for operating under the influence of alcohol or another alcohol-related offense. Although Freeman acknowledged that he had been drinking and had pulled over, and he appeared to have been drinking, the officers did not initiate the stop because of any observations

17

of erratic driving consistent with drunk driving; indeed, the officers had not observed Freeman driving at all. While the available facts provided a basis to conduct further investigation, such as FSTs, the officers had not conducted any and in fact gave no sign before the frisk that they were intending to do so. Under these circumstances, the Court cannot find that an arrest for drunk driving would have been supported by probable cause. *See United States v. Hawk*, No. SAG-17-3030, 2018 WL 3241345, at *2-4 (D. Md. July 3, 2018) (finding that an officer lacked probable cause to arrest the defendant for driving under the influence of alcohol under Maryland law, even though the officer detected an odor of alcohol on the defendant's breath, the defendant had failed one but not all of the FSTs, and the defendant admitted to consuming alcohol the prior evening, where the officers did not observe any driving infractions committed by the defendant, the defendant did not have slurred speech, and had no difficulty providing his license and registration, exiting the vehicle, and walking to and from the location of the FSTs).

The Government's citation to *United States v. Walker*, 607 F. App'x 247 (4th Cir. 2015), does not alter this conclusion. In *Walker*, the court found probable cause to arrest the defendant for driving under the influence of alcohol based on the facts that the defendant "was driving erratically," he "admitted to consuming two alcoholic beverages," and officers testified that they smelled alcohol on the defendant's breath and that he "stumbled at least once on his walk to the rear of the vehicle." *Id.* at 253-54. The erratic driving included crossing into the opposing lane of traffic during a wide turn and driving at a high rate of speed through two stop signs. *Id.* at 253. Here, unlike in *Walker*, the officers did not witness Freeman commit any driving infractions and in fact never saw him operating the vehicle. In the absence of either observations of erratic driving or failed FSTs, and particularly where Freeman provided the officers with the requested

18

documentation and independently exited the vehicle without incident, the Court finds that the facts available to the officers were insufficient to establish probable cause.

Where the Court concludes that the officers lacked either a reasonable suspicion that Freeman was armed and dangerous or probable cause to arrest Freeman for an alcohol-related offense, the firearm seized from the search of Freeman's person must be suppressed. *See United States v. Brown*, 401 F.3d 588, 596, 598 (4th Cir. 2005).

### IV. The Second Firearm

Where the frisk resulting in the recovery of the first firearm was improper, and that firearm provided the basis for the subsequent search of the vehicle, the second firearm recovered during that search must also be suppressed. *See id.* at 592 ("Evidence gathered as fruit of an unreasonable search or seizure is generally inadmissible against a defendant."); *see also United States v. Baker*, 719 F.3d 313, 319-20 (4th Cir. 2013) (noting that the lawfulness of a search of a vehicle was premised on the lawfulness of the initial search of one of its occupants, "which uncovered the items that gave [the officer] probable cause to search the vehicle").

Although the Government, in its brief, also invokes the inevitable discovery doctrine to argue that the firearm in the vehicle should not be suppressed because it would have been found during an inventory search following impoundment of the vehicle, the Government acknowledged at the hearing that it was not relying on that argument. Regardless, the Government has not presented any evidence on this issue that could demonstrate, as necessary to rely on this doctrine, that the circumstances warranted the impoundment of the vehicle even without any arrest of Freeman, or that an inventory search would have been conducted pursuant to routine and standard procedures that would have resulted in the recovery of the firearm in the backpack. *See United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017). Therefore, the evidence obtained from the

officers' subsequent search of Freeman's vehicle, the second firearm found in the backpack in the vehicle, will also be suppressed.

## CONCLUSION

For the foregoing reasons, Freeman's Motion to Suppress will be GRANTED. A separate Order shall issue.

Date: July 11, 2024

THEODORE D. CHUANG
United States District Judge